**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bradley W. ROTHHAMMER,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gary L. MILES, Defendant–Appellant.**

**Nos. 94–1445, 94–1451.[†]**

United States Court of Appeals,
Tenth Circuit.

Aug. 28, 1995.

---

† Because the facts and issues in these cases are similar, we have consolidated the cases for purposes of the opinion. Fed.R.App.P. 3(b).

William R. Lucero, Asst. U.S. Atty. (Henry L. Solano, U.S. Atty., with him on the brief), Denver, CO, for plaintiff-appellee.

Lee D. Foreman (Rachel A. Bellis, with him on the brief) of Haddon, Morgan & Foreman, Denver, CO, for defendant-appellant Bradley W. Rothhammer.

Robert T. McAllister (Barry Boughman and Kathryn Haight, with him on the brief) of McAllister & Murphy, Denver, CO, for defendant-appellant Gary L. Miles.

Before BALDOCK, SETH and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Defendants-appellants Mr. Rothhammer and Mr. Miles appeal their convictions for making false statements to a bank in connection with a loan, in violation of 18 U.S.C. § 1014. Our jurisdiction arises under 28 U.S.C. § 1291 and we reverse.

*Background*

In 1985, a group of land developers doing business as the Austin Capital Corporation ("ACC") attempted to obtain financing to purchase Van Schaack and Company ("VSC"), a real estate company. The principal lender involved in the financing was Security Pacific Bank ("Security Pacific"). In February 1985, collateral was delivered to Security Pacific as security for the first phase of the purchase. The collateral included a one million dollar letter of credit issued by Boomer Hogoboom on behalf of Citizens Bank of Glendale ("Citizens–Glendale"). The letter of credit, however, was not properly authorized by Citizens–Glendale and was backed by non-existent assets.

Mr. Hogoboom and William Wall, an initial principal of ACC, planned on replacing the phony letter of credit with a legitimate one issued by Cherry Creek National Bank in Denver ("Cherry Creek"). Cherry Creek, however, required $250,000 in collateral before it would issue a letter of credit. In order to acquire these funds, Mr. Hogoboom used NSF checks to purchase a $250,000 certificate of deposit at Cherry Creek.

In an effort to obtain money to fund the checks, Mr. Hogoboom contacted Mr. Rothhammer and asked him to take out a $50,000

loan at Citizens–Littleton. Mr. Hogoboom told Mr. Rothhammer that the proceeds of the loan would be used to benefit Mr. Rothhammer's friend, Stan Miles. Mr. Rothhammer signed a promissory note for the amount but maintains that he and Mr. Hogoboom had an understanding that Mr. Rothhammer's signature would have no effect until he spoke to Stan Miles and decided to go ahead with the loan.

Mr. Rothhammer asserts that he subsequently called Citizens–Littleton and left word that he was not going to complete the loan transaction. Mr. Hogoboom nevertheless processed the loan and disbursed the funds to cover the bad checks. Mr. Rothhammer claims that this was done without his knowledge or approval. When Citizens–Littleton notified Mr. Rothhammer that his debt was due, he signed two separate extensions on the loan, allegedly in order to give Mr. Hogoboom time to take care of the debt.

When Equitable Bank Littleton ("Equitable Bank") assumed Mr. Rothhammer's note and attempted to collect it, Mr. Rothhammer refused to pay. Mr. Rothhammer then contacted Mr. Hogoboom and insisted that he pay off the loan. Mr. Hogoboom did not pay off the loan, but did give Mr. Rothhammer a check for $6,200 to go toward a settlement between Mr. Rothhammer and Equitable Bank.

As part of the scheme to raise money to cover the NSF checks, Mr. Wall contacted Defendant Miles and asked him to lend Mr. Wall $125,000 by taking out a loan with Citizens–Littleton. Mr. Miles did not immediately agree to borrow the money. A few days later, however, Mr. Hogoboom went to Mr. Miles' office with a loan application, a promissory note, and a check for $125,000 made payable to Mr. Miles, and Mr. Miles agreed to take out the loan.

Mr. Miles restrictively indorsed the proceeds check, requiring that the check only be used to purchase a certificate of deposit in his name. The check, however, was deposited in Mr. Miles' personal checking account at Citizens–Littleton. Mr. Miles then wrote a check on his personal account to Mr. Wall, who cashed the check, purchased a certificate of deposit with the proceeds, and pledged the certificate of deposit as collateral for the line of credit at Cherry Creek. Several weeks later, Mr. Miles received a letter from Mr. Hogoboom reciting that Citizens–Littleton would not release the funds from the certificate of deposit without Mr. Miles' signature. Mr. Miles maintains that he believed the certificate of deposit would be held to generate interest and that he planned to use its proceeds to repay the loan. The certificate of deposit was eventually released, however, without Mr. Miles' approval. Mr. Miles neither paid off this loan nor received any proceeds from it.

The government agrees that the loan applications and supporting schedules submitted in connection with each of the loans were correct and accurate in all respects. When Equitable Bank assumed the loan to Mr. Miles and attempted to collect it, Mr. Miles refused to pay the debt and instructed Equitable Bank to obtain payment from the certificate of deposit Mr. Hogoboom was supposed to purchase with the proceeds of the loan. Mr. Miles subsequently listed the loan as a contingent liability when he filed for personal bankruptcy, and was granted a discharge.

Mr. Rothhammer was charged by the government with a single count of bank fraud and three counts of making false statements to a bank in connection with a loan, one based on the signing of the promissory note and two based on extensions of the promissory note due date. He was convicted on all three counts of making false statements, but acquitted on the count of bank fraud. Mr. Rothhammer filed a combined motion for judgment of acquittal and new trial, and subsequently filed another motion for new trial based on newly discovered evidence. *See* Fed.R.Crim.P. 33. The trial court denied these motions. Mr. Rothhammer appeals, arguing that 1) as a matter of law, 18 U.S.C. § 1014 does not apply to the contractual "promise to pay" created by the commercial documents he signed, 2) the extension agreements addressed in the counts in the indict-

ment did not "republish" the statement reflected in the note, 3) he made no statement which was "false as to a material fact," 4) the trial court erred by denying his motion for a new trial on the grounds of newly discovered evidence, and 5) the court is prohibited from imposing restitution where the victim "has received or will receive compensation."

Mr. Miles was charged with one count of bank fraud and two counts of making materially false statements on a promissory note and loan extension agreement. He was tried jointly with Mr. Rothhammer by a jury and found guilty only on the count of making materially false statements on a promissory note. Mr. Miles filed a motion for judgment of acquittal notwithstanding the verdict, which was denied. He now appeals, arguing that 1) the evidence presented at trial was insufficient to sustain his conviction and the trial court erred in denying the motion for judgment of acquittal, 2) the "statement" for which he was convicted is neither a "statement" nor "materially false" as a matter of law, and 3) the trial court's restitution order is unlawful in light of the undisputed facts.

## DISCUSSION

### False Statements in Connection With the Loan

Defendants contend that the district court erred in upholding their convictions under 18 U.S.C. § 1014 because that statute does not apply to the promises to pay contained in the promissory notes. We review the district court's interpretation of a statute de novo. *See United States v. Hall,* 20 F.3d 1066, 1068 (10th Cir.1994). Under § 1014, it is a crime to "knowingly make[ ] any false statement or report, or willfully overvalue[ ] any land, property or security, for the purpose of influencing in any way the action of [a described financial institution] ... upon any ... loan." To obtain a conviction under 18 U.S.C. § 1014 the government must prove that the defendant knowingly made a false statement to a bank, which was false as to a material fact, for the purpose of influencing the bank's action. *United States v. Haddock,* 956 F.2d 1534, 1549 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992). Defendants argue that a

promise to pay included in a promissory note is not a false statement.

In *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982), the Supreme Court held that the defendant's issuance of checks that were not supported by sufficient funds did not involve the making of a false statement. The Court's rationale was that a check is not a factual assertion and cannot be characterized as either true or false. *Williams,* 458 U.S. at 284, 102 S.Ct. at 3091. The *Williams* Court held that a narrow interpretation of § 1014 was necessary, hesitating to "render a wide range of conduct violative of federal law." *Id.* at 290, 102 S.Ct. at 3094.

The government argues that *United States v. Bonnett,* 877 F.2d 1450 (10th Cir.1989), limits the application of *Williams* to this case. In *Bonnett,* however, 18 U.S.C. § 1344(a)(1) was involved, not § 1014. Additionally, we did not apply the principles enunciated in *Williams* because *Bonnett* involved a massive scheme to defraud consisting of a series of worthless checks, whereas *Williams* involved a more limited transaction. *See Bonnett,* 877 F.2d at 1454. In this case each Defendant took out one loan, thus the challenged activity of each Defendant involves a single transaction. As a result, we conclude that our holding in *Bonnett* does not displace *Williams* in this discrete situation.

On this record, a promise to pay in a promissory note is not a factual assertion. A promise to pay is a commercial term that means what the legislature chooses it to mean. Colo.Rev.Stat. § 4–3–413(1) (1992) provides that a maker of a note "engages that he will pay the instrument according to its tenor at the time of his engagement...." The promise in a note is defined as "an undertaking to pay and must be more than an acknowledgment of an obligation." Colo. Rev.Stat. § 4–3–102(1)(c) (1992). The promise to pay contained in every promissory note creates an absolute and unconditional liability for the maker on the note. In the absence of some additional evidence, such as extracontractual promises, the subjective intent of the maker is not relevant or material. The legal

liability arising from executing a note in these circumstances did not amount to a factual assertion and thus cannot be construed as a false statement.

The government, however, argues that the promises were false statements because the Defendants promised in the note to pay the debt when they actually had no intent to pay. At oral argument the government, when questioned about its theory, went so far as to suggest that if a parent borrows money to fund a child's college education, and the parent intends that the child rather than the parent will pay the debt, the parent has violated § 1014, regardless of the fact that as a matter of law the parent is ultimately responsible. We refuse to go this far. Indeed, to do so would contravene the Supreme Court's holding in *Williams* that the statute should be narrowly interpreted. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Williams,* 458 U.S. at 290, 102 S.Ct. at 3094 (quotations omitted).

■ Moreover, with respect to a promissory note in the civil context, the Colorado Supreme Court has held that "[t]he thoughts and purposes of the maker, not disclosed at the execution of the contract, may not be given to the jury in an attempt to show that the instrument means something other than what is shown on its face." *McCaffrey v. Mitchell,* 98 Colo. 467, 56 P.2d 926, 929 (1936). Absent valid defenses, the law imputes the legal obligation to pay based upon the standard promise contained in a promissory note, rendering the subjective intent of the maker irrelevant and immaterial in the civil context.

Furthermore, the government's reliance on *United States v. Shah,* 44 F.3d 285 (5th Cir.1995), is misplaced because *Shah* arises under a different statute and did not concern a "promise to pay" contained in a commercial instrument. The *Shah* case involved a solicitation agreement reciting the statement

"[t]he prices in this offer have not been and will not be knowingly disclosed by the offeror...." *Shah,* 44 F.3d at 289. The *Shah* court held that "under section 1001, a promise may amount to a 'false, fictitious or fraudulent' statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform." *Id.* at 294. Here, when Defendants signed the promissory note, they created a legal obligation for themselves on the note; this obligation does not amount to a false statement.

The remaining cases on which the government relies involve explicit misrepresentations of fact by the defendant—the unauthorized use of a signature stamp, *United States v. Falcone,* 934 F.2d 1528, 1542 (11th Cir. 1991), the presentation of forged documents to a bank, *United States v. Tucker,* 773 F.2d 136, 138 (7th Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3337, 92 L.Ed.2d 742, *and cert. denied,* 478 U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986), and misrepresentations regarding the purpose of a loan, *United States v. Smith,* 838 F.2d 436, 440 (10th Cir.1988), *cert. denied,* 490 U.S. 1036, 109 S.Ct. 1935, 104 L.Ed.2d 407 (1989). *See also United States v. Shively,* 715 F.2d 260, 264 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984) (defendant made untrue statement in note regarding purpose of loan). The government concedes that the case at hand does not involve any representations similar to those in the cited cases, thus this purported support is inapposite.

Since we reverse the judgment on the first point of error, we need not address the remaining issues raised by appellants.

REVERSED.